IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| G&P Trucking Co., Inc., | ) | |
| | ) | Civil Action No. 3:14-cv-501 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Zurich American Insurance | ) | |
| Company, as subrogee of SKF | ) | |
| USA, Inc.; SKF USA, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This declaratory judgment action arises out of an accident that occurred near Atlanta, Georgia, in which a truck owned by Plaintiff G&P Trucking, Inc. ("G&P") crashed, allegedly damaging goods owned by Defendant SKF USA, Inc. ("SKF"). Defendant Zurich American Insurance Company ("Zurich") is insurer and subrogee of SKF. Before the court are motions for summary judgment by both G&P and SKF. ECF Nos. 20 (G&P) & 26 (SKF).

The parties disagree as to which law governs the shipment at issue in this case. G&P's position is that the shipment is governed by the terms of a bill of lading issued by the ocean carrier, Pantainer (H.K.) Limited ("Pantainer"), doing business as Pantainer Express Line, in Spain where the goods originated at a factory owned by SKF Espanola S.A. ("SKF Espanola"). G&P contends that the bill of lading may extend the provisions of the Carriage of Goods by Sea Act ("COGSA"), Note following 46 U.S.C. § 30701, to the domestic inland portions of the journey. G&P characterizes the document issued by Pantainer as a through bill of lading. SKF, on the other hand, contends that the movement was in fact two shipments, and that the domestic inland portion from

1

Savannah, Georgia, to Crossville, Tennessee, was a second transaction, governed by a delivery order issued in the United States by Panalpina, Inc. ("Panalpina") and by the provisions of the Carmack Amendment, 49 U.S.C. § 14706.

The court must determine whether the Bill of Lading issued by Pantainer is a through bill of lading. If it is, then its associated terms and conditions and COGSA apply. If it is not, then the Carmack Amendment applies. For the reasons explained more fully below, the court concludes that a genuine issue of material fact exists as to whether the bill of lading is a through bill of lading. Accordingly, the court will hold a hearing during which the parties can present evidence and after which the court can make a factual determination as to the nature of the bill of lading and thereafter rule on the parties' motions for summary judgment.

## I. Factual and Procedural Background

On April 9, 2013, Pantainer issued an "Ocean or Combined Transport Waybill" in Bilbao, Spain, for a shipment of goods to the United States. ECF Nos. 20-3 & 26-5 (hereinafter the "Bill of Lading"). The Bill of Lading lists SKF Espanola, a manufacturer in Spain, as the shipper and SKF, an importer and distributor of automotive parts in Crossville, Tennessee, as the consignee. *Id*. The goods to be shipped were two twenty-foot standard shipping containers said to contain forty-four cases of bearings and ball bearings. *Id*. The Bill of Lading designates several geographic locations:

- The "place of receipt" is given as Fontellas, Spain, an inland town in the Spanish province of Navarra, approximately four hours by road from Barcelona, Spain.

- The "place of loading" is given as Barcelona, Spain, a city on Spain's Mediterranean coast.

- The "port of discharge" is given as Savannah, Georgia.

2

- The "place of delivery" is left blank.

*Id.* The Bill of Lading also indicates "for delivery apply to" Panalpina in Charleston, South Carolina. The Bill states that it is "payable at destination." Finally, the bottom right of the Bill of Lading contains the designation "Panalpina Transp Mundiales S.A." *Id.*

A set of Terms and Conditions was attached to the Bill of Lading and labeled "Pantainer Waybill - Terms and Conditions." ECF Nos. 20-5 & 26-8 (hereinafter the "Terms and Conditions").[1] The fifteen-page Terms and Conditions contains several relevant provisions. In its "Definitions" section, the Terms and Conditions defines:

- "Carrier" as "Pantainer (H.K.) Limited . . . carrying on business as Pantainer Express Line and on whose behalf this Waybill has been issued."

- "Combined Transport" as arising only if "either or both the Place of Receipt and the Place of Delivery are duly indicated in the relevant boxes on the front hereof."

- "Merchant" as including "any person who is or at any time has been or becomes the Shipper, [or] the Consignee . . . ."

- "Sub-Contractors" as including "the owners, charterers and operators of any Vessel, stevedores, terminal operators, forwards, groupage operators, consolidators, warehouse operators, road, rail and air transport operators, and other independent contractors employed directly or indirectly by or for Carrier in the performance of any of Carrier's obligations hereunder, and including subcontractors of any degree."

ECF No. 20-5 at 2. The Terms and Conditions also includes provisions Plaintiff interprets as a so-called "Himalaya Clause":[2]

---

[1] The parties have submitted two slightly differing versions of the Terms and Conditions. That submitted by G&P is dated 2011. ECF No. 20-5 at 12. That submitted by SKF is dated 2015. ECF No. 26-8. Because the 2015 version could not have governed a Bill of Lading issued in 2013, the court uses the 2011 version in this order.

[2] A Himalaya Clause is a provision in a bill of lading that extends the carrier's defenses and the limitations of COGSA to third parties. Black's Law Dictionary

3

> 4.1 Carrier may sub-contract directly or indirectly on any terms the Carriage or any of its obligations hereunder.
>
> 4.2 Merchant warrants that no claim or demand shall be made against any person whomsoever by whom the Carriage is performed or undertaken (including Carrier's servants, agents and Sub-Contractors) other than Carrier which imposes or attempts to impose on any such person or any vessel owned or operated or controlled by any such person, any liability whatsoever in connection with the Goods or the Carriage or this Waybill, whether or not arising out of negligence on the part of such person . . . . Every such person shall have the benefit of all Rights and Defenses herein provided for the benefit of or otherwise available to Carrier as if the same were expressly made also for such person's benefit.

*Id*. at 3.

The Terms and Conditions provides separate schemes for determining Carrier's liability based on whether the transport is port-to-port transport or combined transport. In the case of combined transport, "Carrier shall be responsible for loss or damage occurring during the Carriage from the Place of Receipt or the Port of Loading (whichever is applicable) to the Port of Discharge or the Place of Delivery (whichever is applicable) . . . ." *Id.* at 4, ¶ 7.1. The Terms and Conditions limited Carrier's liability to that provided by COGSA, i.e., $500.00 per package. *Id.* at 5, ¶ 8.1; *see also* Note following 46 U.S.C. § 30701. Finally, the Terms and Conditions defines "package" as the shipping container, if the goods are received by the carrier in such a container. *Id*. at 6, ¶ 8.5.

Once the goods arrived in Savannah, Georgia, Panalpina—a separately incorporated entity, but one related to Pantainer, *see* ECF No. 33-2 at 7-10 (Deposition of Laura Brennan)—contracted on April 25, 2013, with G&P, using a Delivery Order. ECF No. 20-6 at 2 & ECF No. 26-3. The Delivery Order states that the goods are to be picked up from Savannah and are for delivery to SKF

---

(10th ed. 2014), Himalaya clause.

in Crossville, Tennessee. *Id*. The description of the goods in the Delivery Order matches that in the Bill of Lading. *Id*. Barcelona, Spain, is listed as the "port of origin." *Id*. The Order indicates that the shipment was prepaid. *Id*. The Delivery Order also states at bottom right: "Liability including negligence is limited to the sum of $50.00 per shipment, unless a greater valuation shall be paid for or agreed to be paid in writing prior to shipping." *Id*.

On April 28, 2013, while en route from Savannah, Georgia, to Crossville, Tennessee, the G&P truck carrying the shipping container of bearings and ball bearings was in an accident near Atlanta, Georgia. ECF No. 12 at 2 (G&P's answer to SKF's counterclaim admitting that an accident occurred). Nonetheless, delivery of the goods was made in Crossville, Tennessee, on or before May 2, 2013. ECF No. 20-4 at 59 (Delivery Order showing delivery confirmation signature dated "5/2/13"). On May 20, 2013, SKF filed a claim with Zurich for the damaged goods. ECF No. 33-1. The claim documents state that conveyance of the goods was by "vessel," from Spain, carried by Panalpina, and under a bill of lading number matching that of the Bill of Lading issued by Pantainer. *Id*. The type of damages SKF claimed was breakage and damaged packaging. *Id*. SKF sought $101,770.24 from Zurich under its policy. *Id*.

On February 24, 2014, G&P filed this declaratory judgment action against SKF and Zurich seeking a determination of its liability and a determination as to any limitation of liability available to it. ECF No. 1 (Complaint). On January 14, 2014, G&P moved the court for summary judgment in its favor and asked the court to find that it had no liability under the Bill of Lading, or alternatively that its liability was limited to $50.00 by the terms of the Delivery Order or $500.00 by COGSA. ECF No. 20. On March 2, 2015, SKF and Zurich also moved for summary judgment on the issue of liability, asking the court to hold that G&P had not presented evidence of a viable

limitation of liability. ECF No. 26.[3] G&P filed a consolidated response in opposition to SKF's motion and reply on April 2, 2015. The court held a hearing on the summary judgment motions on April 14, 2015. On May 6, 2015, the court entered an order requesting supplemental briefing from the parties on the issue of the condition of the goods when they were delivered to G&P in Savannah. ECF No. 43. The parties completed this briefing by May 18, 2015. ECF Nos. 45 & 46.

## II. Governing Law: COGSA or Carmack Amendment

The court must first determine which law—COGSA or the Carmack Amendment—governs the shipping transaction at issue in this case. G&P's position is that COGSA governs. SKF contends that the Carmack Amendment governs.

### A. COGSA

A bill of lading "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." A through bill of lading covers both the ocean and inland portions of the transport in a single document. *Kawasaki Kisen Kaisha Ltd. v. Regal-Beloit Corp.*, 561 U.S. 89, 94 (2010) (quoting *Norfolk So. R. Co. v. James N. Kirby*, 543 U.S. 14 (2004). Bills of lading may contain a Himalaya clause "which extends the bills' defenses and limitations on liability to parties that sign subcontracts to perform services contemplated by the bills." *Id.*[4]

COGSA governs the terms of bills of lading issued by ocean carriers engaged in foreign trade. *Kawasaki*, 561 U.S. at 96. It requires each carrier to issue to the cargo owner a bill that

---

[3]  SKF's motion for summary judgment also served as a response in opposition to G&P's motion for summary judgment. ECF No. 27.

[4]  The Fourth Circuit does not appear to have considered COGSA since the 2010 Supreme Court decision in *Kawasaki*.

6

contains certain terms. *Id.* By its terms, COGSA only applies to shipments from United States ports to ports of foreign countries and vice versa. *Id.* The statute, however, allows parties "the option of extending [certain COGSA terms] by contract" to cover "the entire period in which [the goods] would be under [a carrier's] responsibility, including [a] period of . . . inland transport." *Id.* (quoting *Kirby,* 543 U.S. at 29). "While COGSA does not provide any limitation of liability in favor of third parties, the parties, by the bill of lading, may extend to third parties the limitation of liability granted the carrier [by COGSA]. . . . Such limitations of liability in the bill of lading in favor of third parties, however, are to be 'strictly construed.'" *Caterpillar Overseas, S.A. v. Marine Transp. Inc.*, 900 F.2d 714, 725 (4th Cir. 1990) (citations omitted). A carrier's liability under COGSA is limited to $500.00 "per package." Note following 46 U.S.C. § 30701.

### B. The Carmack Amendment

The Carmack Amendment, 49 U.S.C. § 14706, governs the liability of motor carriers under receipts and bills of lading. The parties agree that the Carmack Amendment applies if COGSA does not govern.[5] The Amendment provides, in relevant part:

> A carrier providing transportation or service subject to jurisdiction [of the Surface Transportation Board] shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction [of the Surface Transportation Board] are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by
>
> > (A) the receiving carrier,
> > (B) the delivering carrier, or

---

[5]    Under the Bill of Lading, the "Carrier" is Pantainer as explained in the Terms and Conditions. Under the Carmack Amendment, however, G&P is the carrier and Panalpina (as intermediary for SKF) is the shipper.

7

> > (C) another carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading and, except in the case of a freight forwarder, applies to property reconsigned or diverted under a tariff under section 13702.
>
> Failure to issue a receipt or bill of lading does not affect the liability of a carrier. A delivering carrier is deemed to be the carrier performing the line-haul transportation nearest the destination but does not include a carrier providing only a switching service at the destination.

49 U.S.C. § 14706(a).

The Carmack Amendment's purpose is to relieve cargo owners "of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods." *Reider v. Thompson,* 339 U.S. 113, 119 (1950). "To help achieve this goal, Carmack constrains carriers' ability to limit liability by contract." *Kawasaki Kisen*, 561 U.S. at 98;[6] *see also* 49 U.S.C. § 14706(c). Whether the motor carrier in fact issued a Carmack bill of lading is not dispositive of the question of whether the Carmack Amendment applies. *Id*. at 102-103. The Carmack Amendment will apply to "transport of property for which Carmack requires a receiving carrier to issue a bill of lading, regardless of whether that carrier erroneously fails to issue such a bill." *Id*. at 103. By holding that the issuance of a separate bill of lading by the domestic carrier is not determinative of whether the Carmack Amendment applies, the Supreme Court overruled the holding of the Fourth Circuit in *Shao v. Link Cargo (Taiwan) Ltd.*, 986 F.2d 700, 703 (4th Cir.

---

[6] *Kawasaki* addressed the Carmack Amendment's provisions governing rail carriers. The provision governing motor carriers is substantially the same. *Compare* 49 U.S.C. § 11706 (rail carriers) *with* 49 U.S.C. § 14706(a) (motor carriers). The court concludes that the analytical framework of *Kawasaki* applies to this case, notwithstanding the fact that this case involves a motor, rather than a rail, carrier.

1993), that the Carmack Amendment could only apply where the domestic carrier issued a separate bill of lading.

In sum,

> "[F]or Carmack's provisions to apply the journey must begin with a receiving rail carrier, which would have to issue a Carmack-compliant bill of lading. It follows that Carmack does not apply if the property is received at an overseas location under a through bill that covers the transport into an inland location in the United States. In such a case, there is no receiving rail carrier that "receives" the property "for [domestic rail] transportation," § 11706(a), and thus no carrier that must issue a Carmack-compliant bill of lading. The initial carrier in that instance receives the property at the shipment's point of origin for overseas multimodal import transport, not for domestic rail transport."

*Kawasaki Kisen*, 561 U.S. at 103 (quotations, alterations, and citations as in the original). Where the bill of lading issued at the overseas location does *not* cover transport to an inland location in the United States, there exists a receiving domestic carrier required to issue a Carmack-compliant bill of lading.

**C. A Genuine Issue of Material Fact Exists as to Whether the Bill of Lading Is a Through Bill**

The court undertakes analysis of the Bill of Lading in this case as an exercise of the Constitution's grant of admiralty jurisdiction to the federal courts. U.S. Const. Art. III, § 2, cl. 1 (federal judicial power extends to "all Cases of admiralty and maritime jurisdiction"); *see also Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 23 (2004). A bill of lading is a contract between the shipper and the carrier. *Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 738 (4th Cir. 1993). If a particular bill of lading is a "maritime contract" federal law will govern its construction. *Kirby*, 543 U.S. at 23-24. The court concludes that the Bill of Lading issued by

Pantainer in this case is a maritime contract because its "primary objective" is to "accomplish the transportation of goods by sea" from Spain to the United States. *Id.* at 24. Like the bill of lading at issue in *Kirby*, the Bill of Lading in this case "requires substantial carriage of goods by sea, [and] its purpose is to effectuate maritime commerce—and thus it is a maritime contract. Its character as a maritime contract is not defeated simply because it also provides for some land carriage [in Spain and, potentially, in the United States]." *Id.* at 27. Additionally, neither G&P nor SKF has argued that any specific local interest exists sufficient "to beckon interpretation [of the Bill of Lading] by state law." *Id.* Federal admiralty law thus governs the interpretation and construction of the Bill of Lading. *See id.* at 28-29.

Determining whether a shipment is governed by a through bill of lading is a question of fact. *Am. Rd. Serv. Co. v. Consol. Rail Corp.*, 348 F.3d 565, 568 (6th Cir. 2003); *see also Capitol Converting Equip., Inc. v. LEP Trans., Inc.*, 965 F.2d 391, 394 (7th Cir. 1992). In an admiralty proceeding, it is the duty of the court to settle factual disputes. *New Jersey Steam Navigation Co. v. Merchant's Bank of Boston*, 47 U.S. 344, 423 (1847) ("[I]t is our duty to settle facts in an admiralty proceeding, when they are material to the merits"). Whether a particular bill of lading is a through bill is to be determined with reference to various factors, including: "(1) whether the bill of lading indicates the final destination for the goods; (2) whether the freight for the entire shipment was prepaid; and (3) whether a separate, domestic bill of lading ever issued." *Custom Rubber Corp. v. ATS Specialized, Inc.*, 633 F. Supp. 2d 495, 504 (N.D. Ohio 2009). The court may also consider other general aspects of the conduct of the shipper and the carriers. *Marine Office of Am. Corp. v. NYK Lines*, 638 F. Supp. 393, 399 (N.D. Ill. 1985) (collecting cases).

*1. Whether the bill of lading indicates the final destination for the goods*

In this case, the Bill of Lading leaves the "Place of Delivery" blank, and does not, therefore, indicate on its face the final destination of the goods. *See* ECF No. 26-5. G&P urges the court to construe the listing of SKF's Tennessee address in the consignee box as being an indication of the final destination of the goods. A consignee is the "person named in a bill to whom or to whose order the bill promises delivery." Black's Law Dictionary (10th ed. 2010), consignee. There is ambiguity as to whether the address of the consignee is the final destination of the goods and was so understood by the parties, or, alternatively, whether the final destination of the goods was unclear and was to be provided by the consignee at some future date after the issuance of the Bill of Lading.

Further, the Terms and Conditions expressly contemplates the possibility that the Bill of Lading may serve either as a through bill or a normal bill of lading. The document provides that: "Carrier shall be responsible for loss or damage occurring during the Carriage from the Place of Receipt or the Port of Loading (whichever is applicable) to the Port of Discharge or the Place of Delivery (whichever is applicable) . . . ." *Id.* at 4, ¶ 7.1. The term "whichever" is exclusive—meaning "any *one* of two or more." Webster's New World Dictionary, 3rd ed. (1988) at 1521 (entry for "whichever") (emphasis added). Thus, the Bill of Lading may provide for "combined transport," but it is unclear whether this combined transport is only from Fontellas, Spain, the place of receipt, to Savannah, Georgia, the port of discharge, or whether it is, in fact, door-to-door transport from Fontellas, Spain, to Crossville, Tennessee.

*2. Whether the freight for the entire shipment was prepaid*

The court similarly concludes that the record points in no clear direction as to the second factor. The court cannot determine with any certainty whether the freight for the entire shipment

11

was prepaid. The Bill of Lading indicates that it is payable at "destination," and was not, therefore, prepaid. The Delivery Order issued to G&P, on the other hand, indicates that it was "prepaid." Further, Simpson, SKF's warehouse manager, responded to a question about whether the movement from Savannah to Crossville was domestic or international by saying: "It still would have been international normally because it's bonded freight." ECF No. 20-4 at 35:16-21. The Delivery Order confirms that the freight was bonded. The court concludes that a genuine issue of material fact exits as to what, exactly, the payment term was for the transportation of the goods under the Pantainer Bill of Lading.

### 3. Whether a separate, domestic bill of lading ever issued

Finally, the court determines that the third relevant factor, the issuance of a separate domestic bill of lading by the domestic carrier, is no longer of much analytic value after *Kawasaki* in a case such as this. While the issuance of a separate bill of lading strongly implies that the case is within the Carmack Amendment, and therefore, that the original bill of lading is not a through bill, the Supreme Court held in *Kawasaki* that the absence of such a separate, domestic document does not *ipso facto* render the Carmack Amendment inapplicable, and, by default, render the original bill a through bill. *Kawasaki Kisen*, 561 U.S. at 103 (distinguishing several appellate cases where those courts placed primacy on the issuance or non-issuance of a separate domestic bill of lading). Thus, there exists the possibility that G&P may have erroneously failed to issue a separate bill of lading. That possibility substantially limits the value of this third factor in evaluating whether the Bill of Lading is a through bill.

Considering the foregoing factors, the record at present in insufficient to allow the court to determine with any confidence whether the bill of lading is a through bill.  The court will schedule a hearing during which the parties can present further evidence on the issue.

### IV. Conclusion

The court cannot reach the other issues briefed by the parties in their motions for summary judgment until the court determines whether COGSA or the Carmack Amendment governs the shipping transaction—a determination flowing from the court's decision about the nature of the Bill of Lading. The other issues presented by the motions for summary judgment are held in abeyance. An evidentiary hearing will be scheduled during which the parties may present evidence to the court on the issue of whether the Bill of Lading is a through bill.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
Margaret B. Seymour
Senior United States District Judge

Columbia, S.C.
June 18, 2015